May it please the Court, I'm Brian Dunn on behalf of the Plaintiff and Appellants. I'd like to reserve five minutes of my time if that's at all possible. Go ahead. So when we look at the reasons for the Court's granting of summary judgment, we start with the notion that the Court did not address the clearly established prong of qualified immunity. It granted the motion exclusively on the basis of its determination that as a matter of law, the force used was objectively reasonable. And it arrested its entire decision on that basis. Reasonable on the basis that the officers fired in their own defense or defense of others? That they reasonably believed, yes. Yes. But that doesn't preclude us from deciding qualified immunity, correct? I assumed that the Court would say that. And I must state at the outset that my argument for the lack of objective reasonableness, or my argument saying that the shooting, that a reasonable jury could have found that it was not objectively reasonable, is not nearly as strong as an argument that I might raise that the law was clearly established at the time to put them on notice as to the unlawfulness of this shooting. Put another way, you're going to look at it de novo. You're going to look at both prongs of this thing. I believe that... Can I talk about that? Because, I mean, in a normal appeal where qualified immunity is an issue, we could just decide it on prong two and say it's not clearly established. I think this is different because, and correct me if I'm wrong, but there's a Bain Act issue here. And under the Bain Act, we have to decide whether there was a constitutional violation. And there's no qualified immunity for a Bain Act claim. That's correct. But there's also a wrongful death claim that is separate and apart from the Bain Act. How is the wrongful death... Is that basically a negligence claim under California law? They're based on negligence and they're based on battery. Did the district court address that? Yes. And the district court concluded that because the shooting was not objectively reasonable, or because the shooting... I'm sorry, Your Honor. It was objectively reasonable. I'm going to get lost in these words. Because the shooting was objectively reasonable as a matter of law, the state law claims fail. And that is one of the reasons why I think that this appeal is really strong. I'm in your favor on that one. I'll be honest. I've long been a believer that state negligence claims, if wrong... I haven't looked at wrongful death specifically, but I think there should have been a different analysis on that. It should go to the jury. And that's always my point, is that... Well, I don't know about that, but I think there's... I'm not sure that the Fourth Amendment or the Bain Act conclusion should address a wrongful death. But we'll get into that with your opposing counsel. So wrongful death is out there. Are there other state claims? Is there just a flat-out negligence or no? Yeah. Well, what we usually do is we will bring a negligence claim and a battery claim under California law. And the negligence standard is somewhat more broad under Hays because it includes the pre-tactical considerations. The battery claim is more limited to the moment of the shooting. We also include a survival action under the Bain Act. And that dovetails back to the constitutional issue. The primary problem that I have with the lower court's ruling is that it kicked out the state law causes of action summarily without addressing them. And the reason that it kicked out the state law claims was it said that because this shooting is objectively reasonable as a matter of law, those state law claims must also fail. For one, the analysis forecloses the breadth of the negligence claim. But on the other hand, secondly, and as I'd like to argue to the court today, I just don't think there's enough there to say as a matter of law that no jury could conclude that there was a problem with the shooting, that no jury could conclude that a reasonable officer would have found this, each of these shots to be. How do we conduct that analysis? It seems like we've got two questions here. How do we conduct that analysis under the Fourth Amendment? And then how do we conduct that analysis under the state law claims? And under the Fourth Amendment, what do we look to to determine whether this is objectively reasonable? I mean, we have some, I mean, they shot, if I remember right, in this case, they shot the beanbags first, right? And then they shot, and he went down, they didn't, and that was basically all that happened here, right? I can't agree with all of that. Okay. A couple of things. Number one, taking a second point, they didn't just shoot and he went down and that was the end of it. If you listen to the video or the body cam footage, the audio very distinctively depicts when the shots are fired, and it is unmistakable that shots are fired at Mr. Leon as he's falling to the ground, and there's even a single shot fired after he is already on the ground. So they are not just firing, and then after he starts to fall, they stop firing. There are several shots that continue as he's falling, including the majority of the shots. Can I ask you, Mr. Dunn, you know, we do see these cases, you know, regrettably from time to time, tragic that involves loss of life, but in evaluating them, sometimes the cases involve a question of the initial shots. Sometimes they involve a case of the latter shots, essentially on the theory that, you know, the latter shots were gratuitous, unnecessary. What is your theory here? Is it the initial shots or the latter shots or both? It's that every round has to be justified, because every round that any officer presses off... Our cases don't say that, Counsel, but the cases have... We've been told by the Supreme Court time and time again that we have to account for the fact, under that language from Graham versus Conner, that these shootings occur under circumstances that are tense, uncertain, and rapidly evolving, and we have to give a fair amount of deference to officers in the middle of a shooting to what lethal force is necessary in order to minimize or stop the threat. And it seems to me, having watched all of the body cam recordings and preparing for the argument, that we're talking about something that occurred literally within a few seconds, very, very rapid, and that, as you acknowledge, the beanbag rounds apparently were ineffective because of the fact that the decedent was under the influence of methamphetamine. The officers recognized that he was under the influence of something and realized that the beanbag rounds were simply ineffective, and he was still advancing on them with the knife coming across the street. Was he? I cannot agree that he was advancing on them with a knife. I'm looking at that film. It's kind of like Scott versus Harris. It looks to me like no reasonable jury could find that he was not advancing on the officers armed with the knife that he was waving around at the time that the decision to employ lethal force was initially made. So I'm having a hard time seeing your argument with regard to the first volley, if you will. First of all, there's two separate issues that have been raised, and I have to finish with Your Honor's question. What the court will say, and what they've always said, is that an officer is entitled to shoot until the threat ceases. They're entitled to shoot, whether it be five rounds, one round, or 30 rounds. They're entitled to shoot until the threat ceases, no matter how many shots they fire. However, once the threat ceases, they are no longer entitled to shoot. I thought we were talking about, you told me that you're challenging the decision to fire the initial lethal rounds, are you not? I am challenging all the decisions to fire all of the rounds, but they aren't taken the same. The analysis that they were looking at, or the threat that they purportedly saw, is not the same as the latter rounds are fired. It's a very important issue, and I wasn't able to adequately address it, because it goes to your point as well, Your Honor. They have to be responsible for every shot, such that they aren't allowed to deploy lethal rounds if the threat no longer exists. Now, what the court brought out was, he's holding a knife, and he's waving a knife. You can see that on the video cams. But there's no case, federal or state, that says you can shoot a man just for waving a knife. As he's advancing on you, when he's 15 or 20 feet away, it doesn't take very long to close that distance, and now you've got a guy with an eight-inch blade. You've got one civilian who is handcuffed on the street, either kneeling or laying down, with an officer who's laid his rifle down in order to cuff him. So you now have two people that can't defend themselves, and it's the third officer who's one of the first ones to fire. Well, I just saw the video this morning, and I don't think that civilian is in the same position that he was in at the time the shots were fired. In other words... He's not able to defend himself, is he? Well, he's behind the officers at that point, though. He's no longer in the middle of... Basically with him. There are two officers that are very close to him, right? One of them probably is still hanging on to him. They had moved him back away from where... But you're still not addressing that the officer, the perspective of a reasonable officer on the scene, he's got a suspect that may be high on something and is advancing on him, waving the knife, and he's closing the distance. Well, again, I take serious issue with closing the distance, because he's just not, Your Honor. If you look at the video, he's out there, he's doing... I don't want to dance, and I don't want to do any state court demonstrative thing. If we were in state court, I would have been showing the video and pausing it and showing it. I have the image in my mind. I know what you're talking about. He's just not moving towards him. He's laterally... He's holding it, and he's doing this kind of movement, but that is categorically distinguishable from charging. He's not dropping the knife. That's the problem. He's ordered in English and Spanish, and he's not complying with the command. I agree with you completely. Drop the knife. The suspect does not drop the knife. Right. That does not make the shooting objectively reasonable. He has to be threatening someone with that knife. You're saying that because why? He was only 15 feet away. That's not a threat? I think it was more like 25, and... What if he'd been 5 feet? Is that what this case hinges on? It hinges on what the officers are perceiving, and is it fair to conclude that absolutely no reasonable officer would see this otherwise? Because summary judgment based on the objective reasonableness presupposes that this is such a good shooting that as a matter of law, no jury, no reasonable jury could... I'm not sure that's correct, counsel. I don't think that objectively reasonable means we go out and show the video to 100 police officers, and if... If it's 50-50, you get to go to the jury, but you're saying if it's 95-5, saying it's reasonable, you still get to go to the jury. I always... Well, that is a great point, but I do stand by the notion that all inferences should be drawn in favor of the non-moving party, and if we're looking at a video, and there are two interpretations, and one of them has him moving laterally, and one of them has him advancing towards the officer, that type of video, we look at the video. But that's the problem. There's not a factual dispute about that. We watch the video, and we figure that out. I mean... Well, that's a great point, is an interpretational dispute versus factual dispute. The court has indicated that he is advancing towards him. One of the officers says that he's running towards him. We clearly don't see that, but the question really is, is he... He's shot in the middle of the street, right? He gets out of the car. Gets out of the car. And he moves toward the other side of the street, and he's actually shot in the street. That is absolutely. I mean, maybe we're quarreling over the meaning of the word advance, but he has moved from a position where he clearly was not a threat, sitting inside the truck, and he's gotten out, and now he's moving into the street towards three officers, a civilian and two officers, and two of the three are not necessarily in a position to defend themselves from his advance. Understanding that lethal force is a last resort, and understanding that once those shots are fired, you can't take them back. Right. They're going to kill themselves. But they've deployed four beanbag rounds, and apparently with little effect. It's not as if the shots were attenuated in any temporal way from the beanbag rounds. I understand. Because of the distances involved. I mean, this all happened very, very quickly. I mean... Did it have to happen this quickly is my point, Your Honor. Could they have given him time? Now, this is the question. You have a man with a knife. You have a man who's mentally impaired with a knife. You have a man who's mentally impaired with a knife who's not obeying them with a knife. And you've got shooters. But if he's charging at them, there is going to be some kind of a demonstrative act. He is going to point his body towards them. He is going to run towards them. He's going to have that knife out. He's going to have it up over his head. He's going to do something towards them. He's not moving towards them. He's moving around like this. He's moving to the side. You're now kind of getting, I think, at the key issue, which is he was not doing this and running at them with the knife. But the question is, we don't know what he would have done next. He definitely was moving towards that yellow line, whether directly at the officers or slightly diagonal. The video, I don't know that that's material. But where he starts and where he ends up is some distance. And so the question, I guess, that the case raises is, how much longer did they need to wait? And is that not something that's covered by the reasonableness that Graham allows officers to have? Well, you just nailed the issue. I mean, just spot on. We don't know what he's going to do. How long do they have to wait? They have to see him under these circumstances. Because he's 25 feet away, how long is it going to take him to close the distance? Three, four seconds. If he starts really running towards them, but he's not running at all. How long do they have to wait? Right. But that starts to raise real safety questions, right? Because you have him moving towards them in some form or fashion. He has a weapon. And they're surrounding him in a sort of partial semicircle. And so certain people are going to be unable to shoot because they're going to be shooting, essentially, at their fellow officers. And so it's down to the people who he's coming towards. And they have to make a fairly quick judgment as to what his intentions are. And does Graham not give them some measure of leeway on that? Even if in hindsight we can look at this and say, well, gosh, maybe you should have waited another second. Well, perhaps the idea of waiting another second could save the life of this individual. And I don't know if the case law says that you're supposed to err on the side of using a lethal force with an edged weapon. If it's a gun, totally different story. I'll give you that. Totally different story. But with an edged weapon, there has to be some form of provocative act. And whichever way you look at it. Why isn't rejecting, why isn't ignoring, not being affected by the beanbag shot, ignoring the command to put the weapon down and to stop, and advancing towards the officer, why isn't that provocative enough? Well, again, the court is fixated on advancing on the officer. I can't conceive that. I'm also focused on ignoring a command. I'm not entirely sure. Look, when the police command you to do something, you do it. And obviously, when it comes to a weapon, all bets are off if you ignore the command. Now, I'm giving you my view of constitutional law. It's also a view of survival. Any person that is not mentally ill will drop that knife. Any person that is not compromised... Okay, but now you get into, and I had this in the Tabaras case, now you get into, did the officers know that he was mentally ill? I mean, I don't think it's fair to say, oh, well, we're willing to make a judgment call on whether they're mentally ill and that... Oh, that's not what I'm saying. And I get your point. I'm not trying to say that they should have known that. They're not psychs. They're not shrinks. They're not going to know whether he's mentally ill. We did have two officers on the scene who were drug recognition experts, and they are at least qualified to conclude that he's exhibiting behavior that is consistent with being under the influence of either alcohol, drugs, or in this case, both. But we don't kill people for that. Pardon? We wouldn't kill a man for being under the influence of drugs and disobeying. That goes into the analysis as to whether or not there's an explanation for why he wasn't obeying their commands because of the fact that he was essentially not in total control of his mental faculties. But is he trying to stab someone with that knife? That makes it more dangerous. But is he, is his lack of faculties, or is his lack of apprehension of what's happening around him, does that mean that he is trying to stab someone? Because the only reason why If he gets out of the truck and he's displaying the knife, waving it around, and refusing to drop the knife because of the fact that he's drunk and high on methamphetamine, why doesn't that make him even more dangerous than if he were encountered in a situation where he was sober? Because it doesn't conclude that he is going to stab someone with the knife such that he must be killed before he stabs them. Hypothetically speaking, suppose there's no shooting and he continues to laterally move to the side, and he just continues to move all the way out of view to the side. He is probably in a situation where at least they have more force options. There's a dog there. There's a perimeter there. Well, you're probably not going to release the canine if the suspect has an eight-inch knife. That's a good way to get the dog killed. Well, at some point, we have to consider reverence for human life, and we have to consider But the canine officer is not going to want to sacrifice the dog if the dog is going to get killed before the dog can disarm the suspect. Well, because the dog wasn't deployed, and because we don't have a consideration as to that, I'm not entirely sure. It's not a continuum. There's not a stepladder approach to nonlethal force that you have to go through step one, two, three, four before you get to lethal force. And they did try nonlethal options. They gave him warnings. They ordered him to drop the knife. They used the beanbag rounds. But he still gets out. Watch the video. I'm sorry. We're running out of time here. Oh, you're well over. You're way over. But what I'm saying is, you watch it, okay? You can hear that the beanbag has more of a hollow sound. And then it's a thunderous sound. You can see the beanbag rounds on the street after they bounced off him. I can count them. There's no time. There's no discernible time interval. But the point is, the beanbags weren't working. I'm sorry, your Honor. I cut you off. No, no, no. I think maybe what we ought to do is give you a little bit of time for rebuttal. I mean, I don't want to cut this off. This is great. But the one thing that I don't think the factual record supports, the conclusion that they tried the beanbag, it failed. You want him to wait. I want the man to live is what I want. I hear you. I hear you. All right. We actually all share that. Thank you. All right. Thank you. Good morning, Your Honors. May it please the Court, Scott Davenport for the appellees, City of Fullerton Officers Green and Valdez. Before I begin, let me make a couple things perfectly clear that popped up during oral argument today. This is not an excessive force case. It's not even a qualified immunity case. This is a straight-up waiver case. That's how this Court should analyze it. A straight-up what?  Waiver. Yes. Let me talk about that a little bit. You know, there's a cardinal principle in law going back to, I don't know, U.S. v. Rumley, probably before that, that if a case can be resolved on non-constitutional grounds rather than constitutional grounds, that's how it should be resolved. And that's exactly what this case is. Wait. What's waived? I mean, I thought Monell and Due Process claims, I understand those. I guess we didn't ask what the response is. But, I mean, I viewed those as waived. But tell me why the Fourth Amendment. That's one of them, Your Honor, and I appreciate that. But why is the Fourth Amendment and the Bain Act and the wrongful death claims waived? And that's the third one. Let me start with the first one. As to the excessive force case, the Court granted summary judgment on both the reasonableness of the force and also on qualified immunity. That's back in the excerpts of record at page 22. Their brief addresses only the issue of force. They never address qualified immunity whatsoever in their brief. When you attack one of multiple bases for a grant of summary judgment. So your point is we can only deal with the underlying constitutional violation. We can't deal with qualified immunity? That's right. Okay. I mean, at the end of the day, it seems like we have to address the constitutional violation. My point is when the summary judgment is based on two items and they attack one of them, for lack of a better word, I don't mean to be flip about this, but who cares? There was two grounds for the basis of summary judgment. He attacked one of them. Okay. And that may apply to the federal claim, but that doesn't apply to the Bain Act claim. Thank you. And that's the third waiver. We've talked about the first one, the two bases. The second one goes to the Monellman due process. The third one are these state law claims. What briefing did we have on the state law claims? We've got two sentences, no citation at all, and just says, well, because we think there's a tribal issue, you should reverse the state law claims too. That's not enough. And I refer the court to Badgley v. U.S. 957F3-969. Well, that may be as to wrongful death and battery, but that's not as to Bain Act because Bain Act rolls into the Fourth Amendment, doesn't it? No, sure. It absolutely is. It's a state law claim that he has fixed. Well, right, but it's a state law claim that is violated. I mean, is there a difference between the Bain Act claim and a Fourth Amendment claim? The Bain Act, as I read it, is wholly based on a violation of the Fourth Amendment. There is, and I would have loved to have briefing on this. And it's a little, honest to God, I feel a little sandbagged to come in here and have something that was not raised in the briefing all of a sudden get sprung on me in court. That's the reason for the waiver argument here. You can't come in an oral argument and say, well, wait a minute, this is just like this, and spend the first five minutes of your argument talking about how these state law claims are still viable and talk about Hays and talk about what works and what doesn't. Do you think the Bain Act analysis is different than the Fourth Amendment analysis, or is your position you don't know because you haven't had a chance to brief that? I know because of other cases I've had, but it is different. How is it different? Again, it's sort of beyond the scope of where we're going, but educate the court. It may not be because, I mean, the arguments being made, listen, the Fourth Amendment objectively unreasonable test, that slots right into the Bain Act. If that's true, then it's not clear what more they needed to say about the Bain Act. If it's not true, then you have an argument on waiver. I think I have an argument on waiver either way. They should have at least at the very minimum briefed how it was similar, how this works. But on the Bain Act, how does it differ just based on your understanding? I mean, if that's going to be the basis of this decision, I think that we should have a chance to do a supplemental letter on that because that's not something that has been put forth at all. It wasn't even put forth in the reply brief, frankly. So, you know, the thing about waiver, one thing we all agree on, apparently, is that the Fourth Amendment claim is before us. Yes. But your point is, I see, your point is it doesn't matter because you get qualified immunity anyway. That's exactly right. We need not reach that issue because you haven't attacked both bases for the summary judgment. I've got to go back. Did you raise all this waiver argument in your opposition? Absolutely, absolutely. It's in, where am I, pages 11 to 12 and 25 to 30 of my brief. That's eight pages. We got no response at all on that issue in their reply brief. You know, frankly, that's another waiver. They don't even address waiver at all at any point. So that's how this case should be teed up. You know, when the Supreme Court addresses these thorny constitutional issues, you see these long opinions about standing and rightness and things addressing non-constitutional issues rather than just jumping to right in the meat of it, whatever he wants to talk about. Fair enough. I take your point. I think we need to go back and look at that, at the waiver issue. Let's, for purposes, you've still got nine minutes. For purposes of the fact that if we don't agree with you on one or more of these claims, can you tell us why, as to the Fourth Amendment claim? I mean, qualified immunity, you know, I'm not sure we need to go. I mean, he didn't exactly make the most vociferous argument on qualified immunity. His argument was focused on the Fourth Amendment reasonableness. Tell us why this isn't reasonable or why this is reasonable under the Fourth Amendment. Sure. I will. You know, before I do that, I would point out that it's a bit of a Pyrrhic victory if he were to. I understand. You've made your point. All right. Thank you. I appreciate that. You know, I think it is. This is clearly a Scott versus Harris case. It's become a big part of my practice since the, you know, explosion of body-worn camera and cell phones. And, by the way, I love it. It's changed the way I practice laws. It's changed the way we do policing. This is normally where I go and do a deep dive on Scott. But given that it was penned in 2007. I want to make clear. Are you outside counsel or you're with the government? I'm outside counsel, Jim's mayor. So I can't ask you, at least to go back to your client and say, can you help us out by not. Can the police do something to keep these cases from coming up? Because at the end of the day, we do have a dead person. I understand. That arguably didn't need to die. You know, I understand the court's concern. But, I mean, all I'm saying is, can you go back and say, the court has concern about these. We're going to deal with the cases the case needs to be dealt with. But, boy, we'd all like to see less of these. I appreciate that, Judge. And I think we all share that concern. It's something that's continually reevaluated. Like I said, I would normally do a deep dive on Scott. But this was in 2007. It came out of Justice Scalia's courtroom. There are people on this panel that know more about Scott than I ever will. But I think what's ironic about this case is both sides are saying the same side, which is just watch the video. And that's come out over and over again. In fact, opposing counsel here in their opposition, they didn't submit any new evidence other than this amalgam video, the same six videos that we showed, which, by the way, was a really neat thing. I'm going to start using that in my MSJs going forward. But there's no additional evidence. It is just this video. And that's what it comes down to. And everybody sees the same thing, which is you see a man who is not obeying commands, who they believe to be under the influence. Again, we've come up with a thing here about. Where in our analysis do we look at this? They command him. They shoot the beanbags. Are they then entitled to shoot? No, on the beanbags, no. And I want to answer that. Before I do, I just thought of something. He had mentioned mental illness. There's no evidence before the court that there's mental illness.  Don't worry about that. Thank you. But answer my question. Sure. At what point did it become reasonable to shoot? When he stepped out of the van, was it reasonable to shoot? It's when the threat continued, when the officers felt that they were in reasonable danger for their fear, for the fear of their fellow officers, and for the fear of the civilian who was handcuffed and incapacitated. You know, it's important to remember here that he was also. I'm not sure you're answering my question. So what if they had not shot beanbags? Sure. Or what if they hadn't used beanbags first and they just ordered him? He didn't stop and they shot. That would have been reasonable? We'd be having a different conversation here. There would be more conversations about did you use the less intrusive means, and I'd be talking about how they're not required to. They're only required to act reasonable under the totality of the situation. I think it probably would have been. But that's, again, that's. . . You think it would have been reasonable? To answer your question, yeah. That's not before the court, but I'm going to be straightforward. Once they shoot the beanbags and it doesn't stop him and he still disobeys command, is it a categorical rule at that point that they are entitled to shoot? I think that that's probably overstating it, but I think that under these facts it was. And what about these facts makes that clear? Well, you've got to remember, even after he was shot with multiple rounds of beanbags and even after he was shot with bullets and went down, he got back up again. He started to get back up and put the knife to his throat again. So it's not like. . . And they didn't shoot at that point, right? They did not shoot. But if he had stood up and continued to advance, they would have shot again. Do the beanbags really matter here? I mean, it doesn't mean in terms of just the analysis. Sometimes the less lethal, nonlethal is shot, used, and then there is some gap in time. There's not a whole lot of time here, and so I'm not sure how relevant those are in this case. I understand. I think that if they had not shot beanbags, you'd have been asking why didn't they. I know. The fact that they did. . . But the problem with that is, the problem with your answer is it goes to show we're just checking a box. And, I mean, why didn't they wait two or three seconds? I mean, is your position that they shot the beanbags and they had enough time to assess that that did nothing? I think that there's always something in retrospect, when you're a Monday morning quarterbacking, that could have been differently, that things could have happened. That's not the way they happen at 10 o'clock at night when it's pitch black and they're out in the middle of the street and officers are down. It does go to how they're trained. Like, why are they using the beanbags if they're not actually using it as an opportunity to see. . . I mean, you would acknowledge they at least had two seconds to wait and see whether the beanbags worked. I think if he would have immediately dropped or recoiled or gone backwards, he'd have had something different. So your position is they did have an assessment that the beanbags didn't work and that played into the reasonableness here. I cannot tell you what the reaction time was. I'm not an expert on biomechanics and I can't tell you about whether or not there was sufficient time to process this. I know that even if they were followed contemporaneously, these officers who did fire felt that there was an ongoing threat. Two minutes. You've heard enough about qualified immunity? I guess on the prong two, I did not read the district court to reach that prong two. Now, we could reach it, but I don't know that there's a waiver for failure to address that in the opening brief if the district court didn't go there. No, I think there's absolutely a... If the MSHA was granted unqualified immunity, the fact that you didn't address qualified immunity, that was incumbent on them to do that. Well, but the reason they get qualified immunity in this case, according to district court, is because there's no underlying violation in the first place. We don't have to get into the clearly established analysis. Well, where's the discussion about the reasonable mistake of fact and whether the law was required with a degree of certainty under White v. Pauley? You know, you can't just say... But it seems to me that that's almost incumbent upon you to raise as an alternative, because the district... I share Judge Bress's view. I mean, I'll go back and read it, but I didn't view the district court as actually saying, you win on both of these. I read the district court to say, there's no constitutional violation here, end of story. And so then it almost becomes incumbent on you to raise in the alternative that even if I lose on prong one, we still win on prong two. First of all, the court did say that at Exeter Records 22, but I did raise it in my brief. Yeah, you did raise it. No, I'm not saying you didn't. I'm just saying... And there's no response? You know, if we ask, what is your response to... Your point is they didn't respond to qualified immunity in the reply brief. Either. We got another waiver. So, you know, like I say, I think that we should treat this case for what it is, and we don't need to get into the weeds, these thorny weeds about these thorny constitutional issues, because there are just so many issues of waiver in this case. What about... Let's set aside... I mean, we'll have to have the discussion about whether two sentences preserves the state law claims. If the state law claims are here, I mean... And maybe to your point, we'll look at this. Maybe we do need to do some supplemental brief requests. But just your answer sitting here, you agree that the standard for state negligence is not the same as the standard for the Fourth Amendment, correct? Absolutely. So when the district court said, because I've rejected the Fourth Amendment claims, I'm also rejecting the state law claims, and I'm talking about the negligence and the wrongful death claims, that was erroneous as a matter of law, correct? Waiting way too long on it. Well, no, because it's not a simple answer. I think that... I wouldn't have analyzed it that way. I don't think any of you would. But that doesn't mean that we're done. That doesn't mean that you can't affirm under any circumstances. I agree, and it seems to me that the reason to affirm on an alternate basis, and this is your point, which is it hasn't been fully vetted, I assume, the reason to affirm on an alternate basis would be these fail anyway. We could do our own analysis under state law. But why would we remand that to tell the district court, don't do this. Stop equating Fourth Amendment violations with state law claims. You've got to do a separate analysis. Well, I don't think you'd do that because it wasn't... I don't think it was adequately raised and preserved. I understand your preservation argument. I'm saying if we get past that, why wouldn't that be the appropriate result here? On a state law claim of negligence, I have no response to that. I'm out. I'm way out. No, well, we've taken you over. You can always answer our questions. Any other questions before I... All right, thank you. Thank you. All right, I'll be very brief. So before we go any further, I have to direct the court to the court's summary judgment ruling. It is on page 14 at the top, line 2, because the court concludes that the undisputed facts do not establish a constitutional right was violated. The court does not address the second prong of the qualified immunity analysis. Well, that was my recollection, so... That's why it's not in my opening brief, but nevertheless, I did address the cases in the case law in my reply brief. I talked about the Glenn case, which is a nice case. I talked about the Hayes case, which is a nice case. And I talked about the S.B. v. Counting of San Diego case, which is a nice case. I talked about all of those in my reply brief, but I must concede they're not the same as this. And if you look at the perfunctory analysis of just factual comparison, it's very, very difficult to find the same case. And I realize that you may affirm on a different ground with that, but we still have these state law claims, and they're still there. And all of this discussion, very little discussion was in counsel's, and I respect him, but you weren't really talking about the knife or what he was doing with the knife. You were talking about constitutional... You were talking about waiver, talking about all these other things. But he's got a problem when you start asking him hard questions about, is this man charging these people with a knife? How long should we wait after the beanbag? Because it's always going to be subjective. What counsel is going to always say, it's a very easy argument, he felt, the officers felt, quote, felt, that they were dealing with... Counsel, I give you that. I don't think that that... I think I made that clear. We're not putting our finger up... I mean, we're not taking a poll of officers, even the officers here. We're looking at an objectively reasonable standard. That is difficult to do, but I agree that it's a different analysis than what we heard. But one thing you may not understand fully is that everyone's going to look at the decision that you make, and people look at that to determine what is okay and what is not okay, for lack of a better legal term. And there hasn't been any discussion as to the flurry of shots that are fired as he's falling to the ground. The one shot, for sure, that's fired after he is on the ground. And the argument for that is somehow that, well, if they start shooting, they should just continue to shoot, but they are only allowed to continue to shoot if that threat is there. I understand. You understand? We're getting... Do either of my colleagues have further questions? Does anybody have any questions? I don't, but thank you. Thank you. Thank you. Thank you both for your arguments in this case. The case is now submitted, and we're concluded for the day. Thank you. Thank you. All rise. This court, for this session, stands adjourned.
judges: TALLMAN, NELSON, BRESS